RUSSELL JOHNSON and ROSWELL H. JOHNSON, Composing the Firm of JOHNSON BROTHERS, Appellants, *v.* HOWARD T. ALEXANDER and Others, Respondents, Impleaded with Others.

*What participation in profits makes the participants partners as to third persons.*

A participation in the profits of a business renders the participant a partner as to third persons, except where he has no interest in the business or capital thereof, but receives a share in the profits as remuneration for services rendered by him.

An agreement, which recited that one Allen, a party of the second part thereto, had leased certain premises to one Chatterton, the party of the first part thereto, who desired to erect a grand stand thereon; that the remaining parties of the second part, Alexander, Coyne and Tackaberry, had rendered services in securing said lease for Chatterton, and would render other services, provided that Chatterton, in consideration of the lease, should erect a grand stand; that Alexander, Coyne and Tackaberry should sell seats thereon, Tackaberry also acting as treasurer; that the cost of its construction should be assumed by Chatterton, and, together with other expenses, should be first repaid out of the gross receipts of the stand, and that the balance thereof should be divided as follows: "42½% thereof shall belong and be paid to the party of the first part, as compensation for his services in building and supervising the said stand; 20% thereof shall belong and be paid to the said Allen, as compensation for the lease of said premises, and 12½% thereof shall belong and be paid to each of the remaining parties hereto, the said Alexander, Coyne and Tackaberry, as compensation for their services rendered, and to be rendered, in connection with the premises." It was further provided

that upon a settlement the lumber and other materials used in the construction of the stand should at all times belong to Chatterton, and that he might remove them.

*Held*, that the agreement constituted the parties thereto partners as to third parties, who, without knowledge of the agreement, but after its execution, supplied lumber used in the construction of the stand upon Chatterton's order (accepted by Tackaberry) made prior to such execution of the agreement, relying upon Chatterton's representation that the other parties to the agreement were partners with him in the venture and responsible for payment; and that such third parties were entitled to recover the price of such lumber from the parties to the agreement as copartners.

APPEAL by the plaintiffs, Russell Johnson and Roswell H. Johnson, composing the firm of Johnson Brothers, from a judgment of the Supreme Court in favor of the defendants, Howard T. Alexander and others, entered in the office of the clerk of the county of New York on the 8th day of June, 1899, upon the dismissal of the complaint, as to the said defendants, by direction of the court, after a trial before the court and a jury at the New York Trial Term.

*Carlisle Norwood*, for the appellants.

*Edgar J. Kohler*, for the respondent Allen.

*George S. Coleman*, for the respondents Alexander and others.

INGRAHAM, J. :

The liability of the respondents depends upon the relation which they assumed to those dealing with them and largely upon the construction to be given to an agreement between them which contemplated the erection of a stand upon certain premises in the city of New York and the division of the profits arising from the use of the stand. The dedication of the monument to General Grant, which included a parade, having been arranged for April 27, 1897, the erection of stands from which to review that procession had been a question largely discussed, and these defendants entered into an agreement which contemplated the erection of a stand upon the line of march. This general understanding seems to have been entered into some time prior to April 15, 1897, the defendant Allen having procured a lease of some premises on the corner of One Hundred and Nineteenth street and Riverside drive, upon which the stand was to be erected. Chatterton, one of the defendants, testified : " I

· could not say the exact date when I first made my arrangements with the defendants Alexander, Coyne and Tackaberry to have part in this grand stand at 119th street. The exact date I could not swear to, but I presume it was around the 10th or 12th. It was before I filed those specifications. And whatever agreement I had with (them) was subsequently embodied in the written agreement I have referred to." There was some dispute between Chatterton and Allen as to the disposition of the lumber that was to be used in the erection of the stand, and it would seem that the execution of the agreement was delayed until April 19, 1897, because of this dispute, but the terms of the agreement, except in this particular, seem to have been settled at the time named by the witness. On April 19, 1897, the agreement was executed.

By the agreement Chatterton was party of the first part, and the other defendants were parties of the second part. The agreement recites that Allen had theretofore leased a plot of land on the northeasterly corner of Riverside drive and One Hundred and Nineteenth street; that Chatterton desired to erect a grand stand on the front part of said premises for the accommodation of persons wishing to view the parade on the occasion of the dedication of the Grant monument, on April 27, 1897; that Allen had leased the said premises to the first party for the purpose aforesaid, and that Alexander, Coyne and Tackaberry, parties of the second part, had rendered services in securing said lease for Chatterton, and would render other services; that Chatterton, in consideration of the lease, agreed that he would erect upon the premises a grand stand, with a seating capacity of 8,000, and would have the same in readiness before the morning of April 27, 1897; that " the cost of material and labor and all of the expenses incurred in erecting the said stand and taking down and replacing the said signboard (were) to be assumed by the first party (Chatterton), but to be repaid to him out of the gross receipts from the sale of seats and other privileges on said stand, as hereinafter provided;" that Allen confirmed the oral lease of the said premises theretofore made by him to the said first party for the purpose aforesaid; that the remaining parties of the second part, the said Alexander, Coyne and Tackaberry, agreed to sell seats and other privileges on said stand; that out of the gross receipts from the sale of seats and other privileges in connection with said stand

there should be paid, *first*, the cost of the lumber, other materials, labor and all other expenses incurred by the first party in and about the erection of the said stand; *second*, the expenses of ushers, police, watchmen and other attendants in and about the said stand prior to and on the day and night of the said parade; *third*, all cost of advertising and all other incidental expenses incurred by any of the parties to the agreement in connection with the premises. "The balance of the gross receipts shall constitute the net profits, and shall be divided in the manner following, that is to say:

"$42\frac{1}{2}\%$ thereof shall belong and be paid to the party of the first part, as compensation for his services in building and supervising the said stand.

"20% thereof shall belong and be paid to the said Allen, as compensation for the lease of said premises; and

"$12\frac{1}{2}\%$ thereof shall belong and be paid to each of the remaining parties hereto, the said Alexander, Coyne and Tackaberry, as compensation for their services heretofore rendered, and to be rendered, in connection with the premises."

The agreement then provided for the services to be rendered by the various defendants; that Tackaberry was to act as treasurer for the parties to the agreement; that all money received from the sale of seats and other privileges in connection with the said stand should be turned over to the said treasurer, and that all expenses in connection therewith should be paid by the said treasurer upon vouchers duly approved by Chatterton and Alexander, and that the sale of seats and all other privileges should be under the supervision and charge of the said parties of the second part, it being understood that the said Chatterton and Tackaberry should be the managers for and on behalf of all the parties to the agreement; that a settlement under this agreement should be made on the 28th day of April, 1897; that all lumber and other materials used in the construction of said stand should at all times belong to and be the property of the party of the first part (Chatterton); and that the party of the first part should remove, at his own expense, the lumber and other materials and clear up the premises and restore them as near as possible to the condition in which they were before the erection of the said stand; that until all costs and expenses of construction were repaid

to the party of the first part (Chatterton) no other expenses should be paid out of the funds in the treasurer's hands.

Prior to the execution of this agreement, and about the sixteenth of April, an order for the lumber necessary to build this stand had been given by Chatterton and accepted by the plaintiffs. Before the order was accepted there was an interview between the plaintiffs' representative, Chatterton and Tackaberry, at which Chatterton introduced Tackaberry as being interested with him in connection with the grand stand. Chatterton subsequently testified that he introduced Tackaberry as a partner, and also introduced the defendant Coyne to Johnson as a partner. The plaintiffs' representative testified that at that interview Chatterton explained the situation, and said that Tackaberry was responsible and that Mr. Alexander was responsible; and the plaintiffs' representative then thought that it would be better to get an order accepted by one of these people connected with Chatterton. Chatterton then wrote out an order dated April 16, 1897, upon Tackaberry, which is as follows:

" Please pay to Johnson Bros. their bill for lumber furnished for stand erected on east side of Riverside Drive, running from the north side of 119th street, 354 feet north, as audited by Howard Alexander and myself.

                              " W. S. CHATTERTON."

In reply to this order the defendant Tackaberry wrote:

" Will accept the above order when audited by Mr. H. T. Alexander and W. S. Chatterton.

                              " F. H. TACKABERRY."

The plaintiffs furnished the lumber which was used in the erection of the stand. The value of that lumber at the agreed price was $5,324.74; and it was to recover that amount that this action was brought. The action originally was to foreclose a mechanic's lien upon the property filed by the plaintiffs. Subsequently, by a stipulation, the demand to enforce this mechanic's lien was dropped, and the action was changed into one to recover from these defendants as copartners. It appeared that all this lumber was delivered to Chatterton and used by him after the formal execution of this agreement on April nineteenth; and there was evidence to justify a finding by the jury that the lumber was delivered upon the representation by Chatterton that the other parties to the agreement were

his partners or interested with him in the adventure, and were responsible for the payment of the bill for lumber furnished. The written agreement between the parties was not submitted to the plaintiffs or their representatives. All that the plaintiffs knew was that there was a joint adventure or undertaking in which these parties were interested. The obligations of these parties towards each other is not the question here presented. We are concerned only with the obligation towards third parties, and whether or not this agreement constituted these defendants copartners or joint adventurers as to third parties supplying or furnishing materials necessary to the successful prosecution of the adventure.

It is apparent from an examination of this instrument that the sole object of the adventure was to make a profit in which the parties to the agreement were to share in the proportions specified. Allen had obtained a lease of the premises and he contributed that lease to the general stock, and for it he was to receive a percentage of the gross profits. Chatterton, who was a dealer and apparently the only one familiar with the construction of a structure of the character contemplated, was to erect the stand, and in the first instance assume the expenses required for materials and labor, and for his services he was to receive a percentage of the profits. The other parties to the agreement were to render services in disposing of the seats upon the stand, and other privileges connected therewith, and other services in relation to its management, and for their services they were to receive a proportion of the net profits. It is important to consider the way that the net profits were to be ascertained. No part of the proceeds were to be paid for rent of the premises, for the right to use them was furnished by Allen as his contribution to the joint adventure, and he was to render no other services for his proportion of the profits. Chatterton was to erect the stand, but the expense that Chatterton incurred in so erecting the stand and furnishing materials was not to be contributed by him, but was to be paid out of the gross receipts, and until that expense was paid the agreement expressly provided that no net profits were to be distributed. Chatterton was not to contribute to the joint adventure the material and labor incurred in the construction of the stand, because the expense therefor was to be paid out of the gross receipts; or, in other words, by those jointly

interested in the adventure.   He was to contribute his services in procuring the materials and labor and in erecting the structure. His contribution to the adventure, therefore, was the rendition of such services, while the other defendants were to contribute their services in disposing of the seats and other privileges of the stand and the general management of the adventure.   The materials used in the erection of the stand after the parade, which was provided for in the agreement, were to belong to Chatterton, but he was required to pay the cost of removing the same, and such cost was not to be a charge upon the gross receipts.

The intention of the parties to this agreement is, therefore, clear. Its object, as before stated, was to secure gross profits to be divided among those interested.   The net profits were to be ascertained by deducting all the expenses incident to the adventure, including the cost of furnishing the necessary labor and materials.   What, then, are the legal relations of those parties interested in such adventure, and who were to receive the profits — as to third parties ?

The rule in this State does not seem to be in doubt.   As was said by Chief Justice RUGER, in *Hackett* v. *Stanley* (115 N. Y. 627): " This agreement does not, in express terms, purport to form a part- nership ; neither is the intention to do so disclaimed, and the ques- tion is, therefore, whether, in a business carried on under the condi- tions provided for in the contract, the parties thereto became partners as to third persons."   And in discussing that question the chief judge said :   " The application of the rule that ' participation in profits ' renders their recipient a partner in the business from which profits are derived, as to third persons, has been somewhat restricted by modern decisions, but we think that the division of profits must still be considered the most important element in all contracts by which the true relation of parties to a business is to be determined.   We think this rule is founded in strict justice and sound policy.   There can be no injustice in imposing upon those who contract to receive the fruits of an adventure, a liability for credits contracted in its aid, and which are essential to its successful conduct and prosecution.   This liability does not, and ought not, to depend upon the intention of the parties in making their contract to shield themselves from liability, but upon the ground that it is against public policy to permit persons to prosecute an enterprise

which, however successful it may for a time appear to be, is sure in the end to result in advantage to its secret promoters alone, and the ruin and disaster of its creditors and others connected with it." The court then discusses the exceptions to this rule: "Exceptions to the rule are, however, found in cases where a share in profits is contracted to be paid as a measure of compensation to employes for services rendered in the business or for the use of moneys loaned in aid of the enterprise, but when the agreement extends beyond this and provides for a proprietary interest in the profits as a compensation for money advanced and time and services bestowed as a principal in its prosecution, we think that the rule still requires such party to be held as a partner."

In *Leggett* v. *Hyde* (58 N. Y. 276) it appeared that the appellant invested or deposited with a copartnership a sum of money, for which the appellant was to share in the profits of the business of the firm. His share was to be one-third, demandable by him at the end of the year. Judge Folger, in delivering the opinion of the court, says: "The prominent and important facts are that he loaned the firm a sum of money to be employed as capital in its business, and that, therefor, he was entitled to have and demand from it one-third of the profits of its business every half year. In my judgment there results from this, that Putnam and Henneberger, making use of that money as capital in that business, used it there for the benefit of the appellant. Because any return to him for the loan to them must come from the use of it. If not used so that profits were made, he got no return. Further, that he had an interest in the profits, which, while they were anticipatory, was indefinite as to amount, but when they were realized, was measured and specific as to share. Further, that his interest in them was in them as profits; that is, that he had a right, on the lapse of every six months, though having no property in the whole capital, to have an account taken of the business and a division made of the profits then appearing. * * * He had that interest in the profits, as profits, because he could claim a share of them specifically, as they should appear on each six months or other accounting of the business of the term then ended, and could then have and demand payment of his share." And after examining the authorities in this country and in England, Judge Folger continues: "There have been from time to time certain exceptions

established to this rule in a broad statement of it; but the decisions, by which these exceptions have been set up, still recognize the rule that where one is interested in profits as such, he is a partner as to third persons. These exceptions deal with the case of an agent, servant, factor, broker or employe, who, with no interest in the capital or business, is to be remunerated for his services by a compensation from the profits, or by a compensation measured by the profits; or with that of seamen, on whaling or other like voyages, whose reimbursement for their time and labor is to finally depend upon the result of the whole voyage. There are other exceptions, like tenants of land or a ferry or an inn, who are to share with the owners in results as a means of compensation for their labor and services. The decisions which establish these exceptions do not profess to abrogate the rule — only to limit it."

This rule, thus stated by the highest court of the State, is the one which is controlling and which it is our duty to apply. The extent of the rule is well illustrated by the exceptions to 'it which have been recognized. Thus, the rule is general that participation in profits renders their recipient a partner in the business from which the profits are derived, as to third persons. The exceptions are the cases of agent, servant, factor, broker or employee who, with no interest in the business or capital, is to be remunerated for his services by a compensation from the profits, or by a compensation measured by the profits, and where tenants of land or other real property are to share with the owner in results as a compensation for their labor and services. The general principle upon which these exceptions have been established is that in such cases the parties have no interest in the profits or business, but simply have adopted a division of receipts as a method of ascertaining the amount of compensation for the services rendered or property used. But where the parties contemplate that profits as such should be divided, giving to the persons entitled to receive their proportion of such profits the right to call the remaining persons to account; giving each, one to the other, the right to enforce the agreement as a copartner, so that the profits as a whole vest in the adventurers, to be divided among them in the proportions agreed to; then as to third parties the copartnership is formed. The application of this rule is further illustrated in *Hull* v. *Barth* (37 App. Div. 359).

Applying this rule to this particular agreement, it seems to follow that the parties to it were all liable as partners to third parties. Each one made his contribution to the joint adventure, either by a right to use the property or by services to be rendered. Each one had his particular part to perform. The receipts from the whole adventure were to be paid to the treasurer, and the disbursements necessary for the adventure were to be paid upon the audit of two of the members. The balance remaining, in other words, the net profits, were to be divided at the end of the adventure. That either of the joint adventurers could have demanded an accounting, and could have demanded and enforced his right to his share of any profits which had been realized in an action for an accounting, could not be doubted. What more was necessary to constitute such a copartnership? There was no express statement that either party should be ultimately responsible for losses, if losses there should be; but it is not claimed that such an express agreement was necessary. The law imposes such liability.

But it is claimed by the respondents that even if there was a copartnership, only the defendant Chatterton would be liable for the lumber furnished by these plaintiffs. It is not necessary for us to determine whether or not that would be true as between the parties to the agreement. We are dealing now with the liability of these joint adventurers to third parties who furnished the labor and material necessary for the adventure. As to such third parties it was entirely immaterial what agreement the parties as between themselves had made. It is quite clear that under the agreement Chatterton was not to furnish this erected stand as his contribution to the partnership. He was to build and erect the stand, and as between the parties was to assume the obligation of procuring the lumber and labor to erect it; but he was not to contribute the stand as his share to the joint adventure, because it was to be paid for out of the proceeds of the joint adventure; and while under the agreement he might have been responsible to the other parties to it for a failure to procure such material and labor, his act in procuring them, as to third parties, was the act of all the associates, and they were liable for the obligations incurred by him.

The defendant Allen is in the same position as the other defendants. Assuming that the lumber was ordered before the written

agreement had been signed — it was delivered afterwards. It was a liability incurred for the benefit of the copartnership, and was for material necessary for the prosecution of the enterprise. The cost of the lumber was to be paid for out of the receipts, and all the copartners were responsible for the liability incurred in its purchase.

The view that we have taken renders it unnecessary to discuss the other questions argued upon this appeal. We think a fair construction of the agreement makes all the parties to it liable to third parties for indebtedness incurred in carrying out the adventure, and for that reason the dismissal of the complaint was error.

The judgment should be reversed and a new trial ordered, with costs to the appellants to abide the event.

VAN BRUNT, P. J., PATTERSON, O'BRIEN and McLAUGHLIN, JJ., concurred.

Judgment reversed, new trial ordered, costs to appellants to abide event.